IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

|  |  |  |
|---|---|---|
| IN RE THE MATTER OF PERSONAL RESTRAINT OF: | ) ) ) | No.  35087-8-III |
| REUBEN DENIS DWAZI MULAMBA. | ) ) ) ) ) ) ) | UNPUBLISHED OPINION |

FEARING, C.J. — This is our third review of a jury's finding of guilt of Denis

Mulamba on two counts of assault of a child and two counts of criminal mistreatment.

The prosecution arises from physical harm Mulamba meted on his girlfriend's two

children.  We affirmed the convictions in *State v. Mulamba*, 188 Wn. App. 1013 (2015).

During our second review, pursuant to a personal restraint petition, this court reversed

Denis Mulamba's convictions and remanded for a new trial.  *In re Personal Restraint of*

*Mulamba*, 15 Wn. App. 2d 1046 (2020), *rev'd and remanded*, 199 Wn.2d 488, 508 P.3d

645 (2022).  The Washington Supreme Court accepted review of our grant of Denis

Mulamba's personal restraint petition.  The Supreme Court reversed our decision.  *In re*

*Personal Restraint of Mulamba*, 199 Wn.2d 488 (2022).  The Supreme Court remanded to

this court to readdress Mulamba's petition.

We must now decide whether the clerk of the court violated state law when conversing with the deputy prosecuting attorney about the number of jurors needed for voir dire, whether Denis Mulamba suffered prejudice during his sentencing by reason of the withholding of documents by the state of Washington, and whether Mulamba's exceptional sentence is unlawful. We answer all questions in the negative and dismiss Mulamba's personal restraint petition.

FACTS

Because of the numerous assignments of error still remaining for resolution, we again recount the lengthy facts and procedural history of the prosecution of Denis Mulamba. Mulamba's convictions arise from his conduct toward the two young children of Ashley Eli: Stanley, born April 15, 2003, and Jane, born February 24, 2007. We use fictitious names, rather than initials, to humanize the children.

In the summer of 2011, Ashley Eli and her two children lived in Moses Lake. Eli then met petitioner Denis Mulamba at a Moses Lake bar. Eli later worked as a nurse assistant at Golden Age Afh, an adult family home and care facility owned by Mulamba's mother.

In August 2011, Ashley Eli began dating Denis Mulamba, who then attended Central Washington University but returned to Moses Lake on weekends to work at Golden Age Afh. In October 2011, Mulamba rented a two-bedroom apartment in Ellensburg. A month later, Eli and daughter Jane stayed at Mulamba's apartment from

Monday through Thursday, while son Stanley resided with his grandmother in Moses Lake.

Ashley Eli and Denis Mulamba's relationship deteriorated in December 2011 due in part to Mulamba's criticism of Eli for failing to discipline her children. Despite the souring relationship, Eli, who lost employment, and her two children moved into Mulamba's Ellensburg apartment in January 2012. Eli also failed to find employment in Ellensburg. The arguments between Eli and Mulamba increased, with Mulamba telling Eli he would be happier if she disciplined her children. Mulamba labeled Eli a "bad mom." Report of Proceedings (RP) at 138.

On January 13, 2012, after an argument, Ashley Eli sought to leave Denis Mulamba's Ellensburg apartment with her children, but Mulamba commandeered her keys. After police intervened, Eli departed the apartment, but she returned the next day because of belongings remaining inside. She and her children apparently continued to reside in the apartment for weeks thereafter.

The undisputed evidence established grave injuries suffered by Jane and Stanley in late January 2012. Ashley Eli claims that Denis Mulamba caused the injuries, while punishing the children on many occasions. Mulamba claims Eli caused the injuries during her punishment of the children. We relate some of the testimony of both. We interpose some of the trial testimony of Stanley, who blamed Mulamba.

In his trial testimony, Denis Mulamba declared unhappiness with Ashley Eli because Eli's daughter Jane often urinated in her pants and on his apartment floor. Eli failed to discipline Jane for this crude behavior.

At trial, Ashley Eli admitted that, during January 2012, she spanked both children, but she denied using a cable to whip them and denied that her spankings harmed them. Eli initially testified that she first learned, on Saturday, January 21, that Denis Mulamba physically punished her children. Later during trial, Eli recounted an incident of January 14 when Jane wet the bed while staying at the Golden Age Afh in Moses Lake. Eli then spanked Jane on the bottom with her hand, after which Mulamba complained that the spanking insufficiently punished the child. Mulamba thereafter assumed the punishment of both children. On January 14, Mulamba took Jane to the garage of the adult family home. Eli averred that, despite Mulamba and Jane remaining at length in the garage, she did not know what action Mulamba took and did not notice any marks on Jane thereafter.

According to Denis Mulamba, during the week of January 16, 2012, he fell ill, left the Ellensburg apartment, and went to Moses Lake to visit a doctor. On his return, he spent the majority of his time at classes or the school library in order to avoid Eli and her children.

According to Denis Mulamba, he, Ashley Eli, and the two children spent Saturday, and Sunday, January 21 and 22, in Moses Lake. He testified that, on Saturday morning, he directed Eli to take the children home to Ellensburg after discovering that Jane wet the

4

bed. Apparently, Eli did not follow Mulamba's directions to go to Ellensburg. Mulamba denied punishing Jane during that weekend.

During trial testimony, Ashley Eli described several incidents of punishment meted by Denis Mulamba on Stanley and Jane during the weekend of January 21 and 22. On Sunday, January 22, while in Moses Lake at Golden Age Afh, Eli observed Mulamba spank Stanley first with wood and then with a metal bar. She ordered Mulamba to stop when she noticed the spanking caused a bruise on Stanley's buttocks. That same night, during the family's return drive to Ellensburg, Mulamba, according to Eli, threatened to pinch Stanley with pliers. During the trip, Mulamba beat both children with a belt when stopped at a rest stop.

During trial, Stanley averred that Denis Mulamba began hitting him on the back and legs with a belt two weeks after his family moved to Ellensburg. Mulamba once pinched his chest with pliers.

Ashley Eli testified that, sometime during the week of January 23, she went to spank Jane and first noticed bruising on her daughter's young body. During that week, according to Eli, Denis Mulamba beat the children with a belt. She did not then protest because her parents punished her siblings with a belt. Eli added that Mulamba later began use of an electric cord or a coaxial cable. Mulamba also forced Stanley and Jane to perform "wall sits." If a child could not hold the sit for two minutes, Mulamba beat the child and demanded that he or she start the wall sit again. Eli insisted that Mulamba

ordered the wall sits during three separate nights of the week of January 23. During her testimony, Eli admitted that she gagged each child respectively on one occasion, while Mulamba beat the child, in an attempt to stop the child's crying.

During trial, Denis Mulamba recalled that, on Tuesday, January 24, Jane urinated on the floor of the Ellensburg apartment. According to Mulamba, Eli, not him, punished Jane by insisting that she wall sit and by hitting her on the hands with a wire. He did not interfere because Jane was not his child. He left to study at the library. When he returned he saw that Eli had shaved her head, an unsettling event to Mulamba.

During trial testimony, Denis Mulamba declared that Stanley, on the evening of January 25, spilled a drink on the couch, and Ashley Eli instructed him to spank Stanley. Mulamba spanked him with the cord of a phone charger. The next day, he spanked Jane on her bottom with a belt after she urinated on the carpet.

Ashley Eli declared that, on January 26, Denis Mulamba threatened to burn Jane with a clothes iron and that he beat the children with the iron's cord. Nevertheless, she never saw Mulamba burn Jane with the iron. She denied burning Jane. Stanley testified that, although he later saw burns on Jane's legs, he never saw Mulamba burn her. Stanley described an incident, during which Mulamba held an iron so close to his body that he felt heat. Mulamba never burned him, however.

The quartet returned to Moses Lake on Friday evening, January 27. Denis Mulamba testified that he worked the graveyard shift at Golden Age Afh on the night of

6

January 27 and did not see Eli or the children until the afternoon of Sunday, January 29. He remembered that Jane appeared in pain that evening, and Eli asked him to retrieve hydrogen peroxide. Mulamba then went to the library, where he remained until almost midnight, and, on his return home, he told Eli to pack her belongings and leave the apartment. He denied seeing Jane's injuries on the evening of January 29.

According to Ashley Eli, on Sunday, January 29, Jane vomited her dinner. An angry Denis Mulamba accused Jane of purposely vomiting. Mulamba coerced Jane to perform a "wall sit," and, when Jane fell from the wall, Mulamba beat her with the coaxial cable. When Eli undressed her daughter for a bath, she discovered bruises blotching the little girl's body and black wounds on the child's legs. At Eli's direction, Denis Mulamba bathed and cleansed the wounds with hydrogen peroxide.

Stanley declared during trial that, on January 29, Denis Mulamba threatened to burn him, but presented him the option of being burned or going outside in the cold without a coat. Stanley chose to go outside.

On the night of January 29, Ashley Eli, with her two children, left Denis Mulamba's apartment for a motel room. On January 31, after smelling sickness and infection on Jane, Eli took the children to Aspen Women's Domestic Violence Shelter. She explained to Aspen supervisor Kathleen Coppin that she and her children needed housing because her boyfriend beat the children. She declined to identify her boyfriend.

7

Coppin discussed the situation with Ellensburg Police Department Detective Tim Weed, after which Coppin drove Eli, Jane, and Stanley to the police station for interviews.

At the Ellensburg police station, Ashley Eli again refused to identify her boyfriend. Kathleen Coppin, who sat near Jane at the station, noticed her experiencing pain. Coppin drove all three family members to Kittitas Valley Community Hospital's emergency room. At the hospital, Nurse John Yoder examined Jane and observed bruising on Jane's left side and arm and stripes on her back. Yoder smelled an aroma of dead flesh and infection. After raising Jane's nightgown and observing severe burns on the girl's legs, Yoder summoned Dr. David Frick.

While the emergency room waited for the arrival of Dr. David Frick, Erik Davis tended to Stanley. Davis noticed "raised edge marks" that covered Stanley from his shoulder down to his ankle. RP at 536. Stanley told Davis he had been whipped with belts and wires and pinched with pliers.

Dr. David Frick examined Jane and assessed her condition as serious to critical. Frick observed second and third degree burns on Jane's thighs and buttocks which appeared at least three days old. The burns would leave permanent ugly scars. Frick quickly transferred Jane, by airlift, to Seattle's Harborview Burn Center. During an examination of Stanley, the young boy told Dr. Frick that his mother's boyfriend abused him with belts and wire. Frick feared head and liver injuries to Stanley and transferred him by ambulance to Harborview.

8

Detective Tim Weed interviewed Ashley Eli at Kittitas Valley Community Hospital. During the interview, Eli admitted she spanked each of the children with a rainbow belt and folded television cable and that she gagged the children to quiet their cries. She acknowledged striking Stanley with a metal track, purportedly to prevent her boyfriend from doing so.

At Harborview Medical Center, Dr. Kenneth Feldman examined Jane and Stanley. Dr. Feldman diagnosed Jane with a urinary tract infection, anemia, and kidney failure. Feldman opined that Jane could have died from the kidney failure, if left untreated. Feldman found Stanley severely injured throughout his entire young body, except his head. In Dr. Feldman's opinion, the injuries to both children were inflicted over several days.

Child Protective Services employee Marti Miller, with Detective Tim Weed present, interviewed Stanley and Jane on February 2. During the interview, Stanley told Miller that Denis Mulamba had whipped him and his sister with a belt or wire, used a pair of pliers to pinch his skin, one time ordered him to run after the car while his mother drove, and threatened to burn him with an iron. After the car chase incident, Mulamba told Stanley that he was "gonna get beat to death." Clerk's Papers (CP) at 685. Stanley also told Miller that, before the interview, his mother instructed Jane and him not to disclose Mulamba's name. During her interview, Jane told Miller that her mother directed her not to talk about her injuries, to say she had only been spanked on the bottom with a

hand, and not to disclose who spanked her. Jane also told Marti Miller that her mother cleaned the house during some of the abuse.

PROCEDURE

The State of Washington charged Denis Mulamba with four counts all being committed between January 13 and 29, 2012: (1) assault of a child in the first degree under RCW 9A.36.120, with Jane as the victim; (2) assault of a child in the second degree under RCW 9A.36.130, with Stanley as the victim; (3) criminal mistreatment in the first degree under RCW 9A.42.020, with Jane as the victim; and (4) criminal mistreatment in the second degree under RCW 9A.42.030 with Stanley as the victim. The crime of assault entails the act of physically striking a child, while criminal mistreatment involves the failure to procure needed medical treatment for a child.

In a separate proceeding, the State charged Ashley Eli with crimes stemming from the abuse of her two children. Before trial on the charges against Denis Mulamba, Eli reached a plea agreement with the State in her prosecution. In exchange for pleading guilty to two counts of criminal mistreatment and providing testimony in the Mulamba trial, consistent with her interviews with police, the prosecutor would recommend, to the sentencing court, a ten-year prison sentence. Under the agreement, Eli would not be sentenced until after the State knew whether Eli testified favorably in Mulamba's trial.

Between February 2012 and beyond the trial of Denis Mulamba, Ashley Eli resided at the Kittitas County Corrections Center. According to jail records, Eli caused

10

disruption and engaged in violent outbursts due to mental health illness, including depression. Between May and October 2012, Ashley Eli received thirteen infractions for possession of contraband, possession of a weapon, mailing notes between inmates, inappropriate language, screaming, refusing orders, escape, banging on doors, resisting restraints, refusing placement, attempting to riot, wreaking property damage, and self-mutilation.

Ashley Eli suffered from anxiety while in jail. The county mental health professional visited with Eli on numerous occasions in the jail. Eli frequently refused meals and some days went without any food. She often pounded on her prison door. She verbally abused jail officers. She spontaneously removed clothing. She repeatedly smuggled razors into the jail.

Records since produced by the jail include documents prepared by Central Washington Comprehensive Mental Health. Some of the records are unreadable. A February 15, 2012, note from the mental health facility records that Ashley Eli suffers from depression and maintains suicidal ideation.

In late May 2012, Ashley Eli hid a razor in her cell, which concealment raised concerns about suicidal ideation. In a May 25, 2012, postcard to a friend, Eli indicated that the officer who found the razor saved her life. A comprehensive mental health note, from June 20, 2012, documents Eli sitting in the fetal position and continuously crying after a suicide attempt.

On August 10, 2012, Ashley Eli hoarded a razor under her sink. She stated then that she often thought of hurting herself.

Because of uncontrolled behavior on September 10, 2012, prison officers placed Eli in a restraint chair. Because of her bouncing in and damage to the chair, officers transferred her to a restraint board. On the night of September 10, Eli continuously banged on her cell door for one and one-half hours. On September 12, Eli refused meals and tore an infraction notice served on her.

On October 21, 2012, Ashley Eli slit her arm with a razor. Jails officials then again removed all sharp objects from Eli. On October 23, Eli wrote a suicide note.

On October 26, a jail sergeant wrote a note that read, in part: Ashley Eli "cannot be trusted by the way she hides, hordes, and lies. . . ." Supplemental declaration of Neil M. Fox with Additional Exhibits (Fox supplemental declaration) at 215. The note referred to Eli as being in a "downward spiral." Fox supplemental declaration at 215. The sergeant wrote the note one week before Denis Mulamba's trial and during the time that the prosecuting attorney met with Eli to prepare her for trial.

Jail records indicate that the prosecutor met with Ashley Eli on multiple occasions prior to trial. On October 22, 2012, the prosecuting attorney met with Eli. On October 23, the prosecuting attorney again met again with Eli. A jail note reads that Eli refused instructions by officers when transported to the October 23 meeting, although the record does not indicate whether she behaved badly in the prosecutor's presence. In

12

postsentence attacks on her guilty plea, Eli asserted that the deputy prosecutor visited her in jail, knew of her mental health illness, and told her things would be better in prison.

We do not know what, if any, records Denis Mulamba's trial counsel demanded from the State before trial. We do not know what, if any, records the State produced to Mulamba's attorney before trial. We know that the State provided trial counsel no records from Ashley Eli's incarceration.

A seven-day trial in Denis Mulamba's prosecution began on October 31, 2012. On November 1, Ashley Eli testified at trial while shackled and dressed in prison garb. Eli testified that she agreed to plead guilty to two charges of criminal mistreatment based on her delay in seeking medical help in exchange for a ten-year sentence, on the condition that she would testify for the State. She admitted that, under the agreement, if she failed to testify she would receive a fifteen-year sentence. She admitted that she agreed to blame Denis Mulamba.

During trial, Ashley Eli informed the jury that she lied when she told a police officer that she used a belt and a television cable to beat her children. She claimed that she did not see Jane's injuries until January 29 because, before that Sunday, Jane bathed herself. Counsel presented Eli with a letter that showed, as early as January 28, she saw open wounds after noticing blood in Jane's underwear and that Eli then asked Denis Mulamba to garner medical supplies to treat the wounds. During testimony, Eli claimed that, despite leaving Mulamba's apartment on January 29, she delayed taking her children

13

to the hospital for two days because of the expectation that medical professionals would blame her for the injuries.

During trial, Jane identified Denis Mulamba as the person who hurt her, but she failed to recall any details about her punishments other than that Mulamba struck her on her bottom. She told the jury that neither her mother nor Mulamba ever burned her.

During trial, Denis Mulamba admitted that, during a police interview, he stated that Ashley Eli granted him permission to spank the children on their bottoms with his hand, belt, or a wire. He admitted to spanking the children, but denied ever using a coaxial cable. He insisted that Eli whipped the children with the coaxial cable. Mulamba denied using pliers to pinch Stanley, but admitted he pinched Stanley on the stomach area and the pinching likely caused bruising. He denied burning Jane with the iron or threatening Stanley with the iron, and he further denied seeing Eli inflict any injuries with the iron.

During his testimony, Denis Mulamba told the jury that he thought Ashley Eli was crazy and acting erratically in January. He averred that he spent most of the month trying to remove her and her children from his apartment. He suggested that, because of his work and school, he maintained scant contact with the children during late January and that Eli had countless opportunities to injure the children in his absence. He assumed that Eli caused all of the children's serious injuries.

During cross-examination of Denis Mulamba, the prosecuting attorney established Mulamba as being a convicted thief. The prosecutor posed a question to Mulamba about his difficulty with the truth.

During the State's closing statement, the State's counsel compared the credibility of Denis Mulamba with Ashley Eli. He often attacked the credibility of Mulamba by juxtaposing his trial testimony with inconsistent statements to law enforcement officers. In turn, counsel bolstered Eli's credibility:

> But in evaluating the credibility of Ashley within the world she lives in are those admissions of a woman attempting to minimize her culpability or a description a real life description of how this is going down.

RP at 1084. Counsel added:

> Because the case doesn't just hinge upon Ashley Eli but yet I would submit to you there's a stream of evidence and truth that flows through her testimony.

RP at 1084.

In closing statement, defense counsel attempted to rebut the State's counsel's comments about Ashley Eli's credibility. Mulamba's attorney intoned:

> But the prosecutor starts off by talking how Ashley should still be believed. Who are we kidding? He is saying she's nuts. She's crazy but we should believe her when she says she can't remember if she saw [Jane] wounded on Friday or Saturday or Sunday.

RP at 1099-1100.

The jury found Denis Mulamba guilty of first degree child assault of Jane, second degree child assault of Stanley, first degree criminal mistreatment of Jane, and third

15

degree criminal mistreatment of Stanley. The jury also returned special verdicts for counts 1, 2, and 3 by answering "yes" to the question of whether Mulamba knew or should have known that the "victim of the current offense was particularly vulnerable or incapable of resistance." CP at 479-80, 483.

On November 15, 2012, Ashley Eli wrapped a sheet around her neck and tied the sheet to holes in a top bunk. Jail officers found her leaning back and straining the sheet against the back of her neck. Her face had turned blue. Officers untied the sheet and placed her on a restraint board. She refused to speak to officers. The jail placed Eli on suicide watch. In the coming days, she refused food and her medications.

The trial court sentenced Ashley Eli on November 26, 2012. During the sentencing hearing, the deputy prosecutor commented that the State entered an agreement with Eli, who participated in Denis Mulamba's offenses. The State's attorney suggested that the jury found Mulamba guilty, despite finding Eli less than truthful. The prosecutor thanked Eli for her testimony, stated the State's belief that Eli had pled guilty to the crimes she committed against her children, and characterized her conduct as "inexcusable" and "horrific." Personal Restraint Petition (PRP), exhibit (Ex.) 20. at 325. The prosecutor commented that Eli made poor decisions when caught in a difficult situation.

16

During the sentencing hearing, Ashley Eli's counsel remarked that Eli took

responsibility for her conduct and had acted politely in court. Eli pledged to use her

mistake as an opportunity to improve herself. Through counsel, she asked for leniency.

When announcing Ashley Eli's sentence, the trial court commented:

> Ms. Eli, I have thought a lot about your sentencing today and I have
> got two options in the big scheme. I could say a whole lot or I could just
> say not much because I don't know if there is a whole lot more that needs to
> be said. And I am going to err on the latter. In other words, you know what
> happened. Your attorney has come before this Court and said that you did
> this plea for your children and that you were credible and that you were
> honest. I'm not here to say you were credible and you were honest because
> I don't really know if you were or not you came before the Court and you
> testified from all intents and purposes or for all intents and purposes you
> followed the plea agreement that you were asked to follow. And basically I
> just saw it as you agreed you would come in here and testify. There was
> reference throughout the trial with Mr. Mulamba you had to testify a certain
> way and I didn't see it that way. I saw it as you had to come in here and
> testify and basically adhere to what you told the police and presumably
> that's what you did.
> . . . .
> You come before me and say you love your children and you're
> ashamed to have to stand here and you take responsibility. I would imagine
> it would go so much deeper than shame. And I'm—I'm kind of sort of all
> over the place here because different things have come to my mind. . . .
> Again I guess when you say you pled for your children and you took
> responsibility for your children, ultimately that ride you did go to Aspen.
> Thank goodness you did it. Boggles my mind that it took you as long as it
> did. It absolutely boggles my mind. I'm not a doctor by any means but
> thank goodness you went when you did. That goodness you didn't leave
> Aspen. Thank goodness you didn't leave the police department. Thank
> goodness you didn't run when you probable had a chance. You ultimately
> did what a mother needed to for her kids ultimately. But it took you way
> too long. Do you understand that?
> . . . .
> There is no person, there's no man, there's no nothing out there that
> should override that protection of your child. And you let that happen. But

17

again ultimately you did the right thing and so I thank you for that. And your children they may or may not thank you. I don't know but I do, for now. I am going to follow the agreed recommendation. I think it absolutely is appropriate given your admission, given your testimony, given your stipulation I will orally state what set forth in the plea which is that you—that the defendant and the State both stipulated that justice is best served by imposition of the exceptional sentence above the [s]tandard range and the court does find I do that exceptional sentence further and is consistent with the interest of justice

PRP, Ex. 20 at 333-35.

The trial court sentenced Denis Mulamba four days later on November 30, 2012.

The State asked the Court to impose an exceptional sentence by imposing the maximum

on each count and running Mulamba's sentences consecutively, for a total sentence of

forty years, the maximum authorized by statute. PRP, Ex. 9 at 118-19. The trial court

decided to impose an exceptional sentence, noting:

And I am going to find that there are substantial and compelling reasons which justify an exceptional sentence, and that being based on RCW 9.94A.535(3)(b), and that aggravating factor was the fact that was found by the jury beyond a reasonable doubt that you knew or should have known that [Jane] and [Stanley] were particularly vulnerable or incapable of resistance.

Your attorney is absolutely right that we cannot rely upon the age alone of these children to say, "Four and eight, therefore exceptionally vulnerable." That's correct. And your attorney spent a good bit of time sort of reiterating why it is that in this case that's all we have, and I do not see it that way at all. In fact, what I see, first off, what we know is that the jury, in fact, found the aggravating factor, we know that by beyond a reasonable doubt. My job now is to determine whether or not that aggravating factor warrants and is a substantial and compelling basis for imposing the exceptional sentence. And the reason why I do and the reason why I agree with the vulnerability is two-fold. Actually, more like five-fold. One, we've got the age of the children, that's a fact, a four and an eight-year-old. But more importantly, Mr. Mulamba, what I find, and when I put it

18

altogether and put it sort of down on the table and sort of look down at it from above, their vulnerability is not only because of their age, their vulnerability is because of the situation you created. You created their vulnerability, and you and Ms. Eli together, but you in particular created that vulnerability and I'm going to take a minute and sort of go through why it is that I find that and why again that circumstance and that aggravating factor warrants the exceptional sentence.

First off the obvious, [Stanley's] age, eight years old, the obvious, [Jane's] age, four years old. We have a situation, and I, I went back and . . . you know, for sentencing I—you know, we don't need to rehash all the facts, of course, but I'm going to on a few, again to, to impress upon you the vulnerability factor of these children. I reviewed [Stanley's] note where he indicated, "When were you hit? At night." At night is when they were hit. Not during the day. Nighttime makes things even a little more vulnerable than daytime. When asked, "Why did he hit you," and [Stanley] testified, "He would hit us if we—" hit us, so that's me and [Jane] "He would hit us if we did not answer fast enough." Kids can't answer quickly. Scared kids can't answer quickly. These kids were vulnerable and they couldn't answer quickly enough and, according to [Stanley's] testimony before myself and before the jury, that was one of the reasons that you hit them the way that you did and as much as you did.

Next point, [Stanley] testified that you told them, you said, "Go get a wire so that I, so that I can hit you with, and if you don't get it, I'll go get it." That makes them even more vulnerable, and it certainly makes them incapable of resistance, whether that's a child or an adult. You tell someone to go get the instrument that I'm about to use against you and that is creating vulnerability, that is creating an incapability to resist, and the kids, then, went and did that and got what, what you instructed them to do.

We have Ms. Eli, who, by all accounts, was not a good mother, and by all accounts pled guilty and has been sentenced, *etcetera*. But she, too, added your knowledge of her inability to protect her children added to that vulnerability (sic). In other words, you knew they were vulnerable, you knew they didn't have a mother that was going to protect them. You knew that. She gave you permission, as you testified, to do what you did in hitting them. Again, this whole vulnerability, it, it comes—you cannot look at these two kids in this situation and just go, boom, got hit, age four, vulnerable. No, it goes much bigger than that. And, so, I've had the benefit, as did the jury, of sitting back and hearing this whole scheme, these whole few weeks and how the momentum built.

Next, and, and I guess this is sort of my theme and I'm sort of putting it as another item, but it sort of begins with my theme of my whole basis for the exceptional sentence here is again, you not only knew of this vulnerability, but you created it. Now, how do I think that you created this vulnerability in addition to what I already said? I went through and reviewed parts of [Stanley's] testimony, and things that you did and things that you said that did not necessarily physically injure them, but whether they were a four-year-old, an eight-year-old or a 20-year-old or a 70-year-old, you instilled in them, anyone could see that you instilled in them such fear that there was no way they were ever going to resist anything you did to them. [Stanley] testified that he saw his sister's burns and, "Denis threatened to burn me with an iron and asked if I wanted to get burned or got outside." [Stanley] testified, "He burned me with the lighter and I felt heat from the lighter. He struck the iron close to my face and close to my chest about one foot. I could feel the heat." Now, was that charged as an assault? No. Is this information I can consider? You bet I can consider this.

Counsel made the argument that my hands are so tied and I can't consider all this information, and while it's true I can't if I'm using that as a basis for an exceptional sentence, but they are facts that are before the Court, they are facts I can rely upon even before we get to the exceptional sentence. It's when determining whether low end, middle range or high range within there, I mean, I could just rely upon all these facts right there. And, again, these are facts I have and this is no backdoor way of using an aggravating factor that was not pled and proved. This is information that was before the Court and that the, the jury considered. So this is what [Stanley] is talking about.

[Stanley] goes on to say, "I told him it hurt, but Denis said it doesn't hurt as much as this, and then he lifted [Jane's] shirt. He stuck a lighter above my leg, he said he wanted to make my leg hurt." [Stanley] was then asked, "Well, what happened," and his answer was, "He put salt on my leg." Okay. Well, again, is that charged as an assault? No. Is that information that goes towards some exceptional sentence? No. This is a fact that occurred to this child that added to the vulnerability of this child. This child, it's interesting when Counsel said, "It could've been my child or anybody else's child in this room." No. No, because no other child had to live in this situation where it was this momentum building, where it was day in and day out, whether it happened on the 13th, 15th, 19th or 29th, the fact is this was going on and this was the atmosphere and this was the home in which these children lived in this pervasive vulnerability perpetuated and,

and were instilled in these children.  No child, no adult should have to hear that kind of threat or those comments to be said to them.

[Jane] likewise, for all intents and purposes, same factors all going into the vulnerability of her and her inability to resist, and even more so, of course, because she was four years old.  And, so, age does come into effect, we're allowed to that into effect.  That doesn't strap me to the standard range.  It is a factor, plus others.  But she's four years old, very small, clearly incapable of resisting.  Again, when were they hit, she didn't say this but [Stanley] did, nighttime.  Again, "Told us to go find a wire," that implying him and his sister, and so again, she, she's having that vulnerability of having to do what this adult whose home that she's living in is telling her to do.

She—Finally there was the, the testimony from [Stanley] that if [Jane] peed in her bed, she'd get hit, and then it went on and Ashley testified about how much this angers you and that she started peeing even when she was awake.  You testified how much this angered you and, and how annoying it was and peeing on the carpet and things like that, these are things that this—she's a kid, that this kid did, and her own actions made her vulnerable because you didn't like it.  You didn't like her urinating, you didn't like her getting it on the sheets, and again, all part of her vulnerability.  Not just because she's a kid, but she's a kid and wetting her bed, she's vulnerable, she's incapable of resisting and, and she's assaulted by you.

You brought them into your home.  I am putting absolutely no weight on whether you wanted them there or didn't want them there.  They were there.  And, and there were times where you cared for them when the mother left, and bottom line is, again, they lived in your home.  You admitted to assaulting them with the wire and the phone cord, pinching them, not with pliers, I know you did not admit to that, and then over time you admitted that you started to notice that they had the injuries, you started to see marks on [Stanley's] arms, you saw marks on [Stanley's] stomach, you saw marks on [Jane] you noticed by Sunday, January 29th, that she was wincing.  Again, this whole snowballing of the assault, what you noticed and what you, what you failed to care for and, and do for these kids.

. . . In determining . . . Actually I want to back step.  The other factors, the information that's before the Court and, again, even before we get to the exceptional sentence, two facts that stick with me as mentioned by the Prosecutor, but I would've noted them regardless, of the number of professionals that came before this Court and who in all their years of doing what they had done, who one assumes that one does something for a long

time they get either cynical or hardened or something, that didn't, that didn't happen. We had doctors that came before this Court and when looking at the photos of what had happened, it brought a tear to their eye. It upset them. And was it because they saw the burns or was it because they saw what was referred to by Dr. Feldman, the hundreds of blows on [Stanley]. And you'll note, I'm not spending a lot of attention and time on, "Did you burn them?" I would be repeating what the two of you have both said. But even if we put that whole burn aside, we have two children that were taken to the hospital and, by all accounts, were probably the worst looking injuries any professionals that dealt with them had ever seen. Seen and smelled, that's a significant fact. The sensory aspect of this is overwhelming. Again, that doesn't even need to get to the exceptional sentence point and those are facts that this Court can rely upon and consider when determining what to sentence.

Having said that, Mr. Mulamba, and in conjunction with that taking into account what I heard about how the children are doing now, and we can all kind of guess how someone might be doing now after having gone through what they went through, but a few points that were made really stuck with me, and I hope will stick with you, and the, the lifelong bruising, the lifelong scarring and, and I understand, I understand what your parents want you to get a second chance and in essence a maximum sentencing being a life sentence; unfortunately, these kids got a life sentence. They did. They will forever. And that description of them having whip marks down their backs and legs that will be there forever, forever, that is a lifelong sentence to those kids, and that was significant to me. Lifelong sentence for scars and lifelong sentence emotionally.

Therefore, Mr. Mulamba, the jury having found you guilty, the jury having found the factual basis of an aggravating factor of particularly vulnerable or incapable of resistance, it not being the same course of conduct, I, I do find that there is substantial and compelling reasons to impose an exceptional sentence. I'm going to impose on Count I, the standard range being 120 to 160, the maximum term of 20 years, I'm going to impose the maximum term of 20 on assault—on Count number I. On Count number II, 46 months to 61 months is the standard range, the maximum term being 10 years, I'm going to impose the 10 years on that. Count III, 62 months to 82 months is the standard range, the maximum being 10 years, I'm going to impose the 10 years.

PRP, Ex. 9 at 163-74.

The trial court imposed the maximum sentence on each count: twenty years on count 1, ten years on count 2, and ten years on count 3. The trial court ran the counts consecutive to each other, imposing a total sentence of 40 years. Ex. 9 at 174-75; CP 514. The court did not file written findings and conclusions supporting the imposition of the exceptional sentence.

We affirmed the convictions in *State v. Mulamba*, 188 Wn. App. 1013 (2015). On appeal, Mulamba principally argued that the trial court permitted the introduction of child hearsay testimony in conflict with the child hearsay statute, RCW 9A.44.120.

Denis Mulamba filed this personal restraint petition. His petition asserts that: (1) the constitutional vicinage requirement was violated when the jury was comprised of Kittitas County residents, but he was charged with committing assaults in Grant County; (2) appellate counsel was ineffective for failing to raise the vicinage issue on direct appeal; (3) the prosecutor engaged in ex parte contacts with the jury coordinator that resulted in a material departure from the jury selection statutes; (4) Mulamba was entitled to a jury unanimity instruction; (5) the State failed to disclose *Brady* material, relevant to his guilt or innocence, when it failed to disclose jail records of the principal witness against him; (6) the State failed to disclose *Brady* material, relevant to his sentencing, when it failed to disclose jail records of the principal witness against him; (7) trial counsel performed ineffectively when failing to discover the jail records, (8) exceptional sentences imposed on him violated the Sentencing Reform Act of 1981, (SRA) chapter

23

9.94A RCW because the court failed to enter written findings and the court's oral rulings are insufficient to support the exceptional sentences, (9) appellate counsel was ineffective for failing to raise the lack of written findings supporting the exceptional sentence, (10) the sentencing court engaged in improper fact finding and based the exceptional sentence on aggravating factors not found by the jury, and (11) Washington's current statutory scheme violates the right to due process and the right to a jury trial when the court, rather than the jury, determined whether substantial and compelling reasons existed for exceptional sentences.

Denis Mulamba's personal restraint petition alleged that after his trial, he discovered that the prosecutor conducted ex parte communications with an employee at the Kittitas County Superior Court regarding jury management. Mulamba claimed that this employee improperly altered the manner in which she was handling hardship exemptions for jurors summoned for the Mulamba trial based on her communications with the prosecutor and that this new method failed to ensure the random selection of a jury panel.

This court ordered a reference hearing and directed the superior court to make written findings of fact as to (1) whether the jury selection method used by the county complied with RCW 2.36 and ensured random selection of the jury list and panel, (2) if the method did not comply with RCW 2.36, whether it substantially complied or materially departed from the statutes, and (3) if the selection process was irregular but

substantially complied, whether Mulamba was prejudiced by the irregularity. Order for

Reference Hearing, *In re Personal Restraint of Mulamba*, No. 35087-8-III, at 3 (Wash.

Ct. App. March 27, 2019).

The reference hearing occurred on June 6, 2019. The State called two witnesses,

Chris Herion, a former deputy prosecuting attorney for Kittitas County who was the

prosecutor for Mulamba's trial, and Laurie Haberman, who served as jury coordinator for

Kittitas County Superior Court in 2012. Mulamba did not call any witnesses but

submitted a sworn declaration from Olvar Klein, Mulamba's trial attorney.

Based on the testimony and written documents, the superior court found as

follows:

> 4. Kittitas County contracts with a business known as Courthouse
> Technologies to randomly select jurors for jury pools. The county sends the
> master jury list to Courthouse Technologies annually. When a pool of jurors
> is needed for a trial, the jury coordinator notifies Courthouse Technologies,
> at least thirty days in advance, of the date and number of jurors needed.
> Courthouse Technologies randomly selects the requested number of jurors
> from the master list and sends out jury summons to those selected.
> 5. Each Summons requires the recipient to answer questions
> regarding age, residency, citizenship and if they have been convicted of a
> felony. The summons also have additional space for Jurors to make
> comments. Jurors are required to answer the questions and return the
> Summons to the Kittitas County Superior Court. The Summons also have a
> return address to the Kittitas County Superior Court on the outside of the
> envelope.
> 6. Jurors serve for two weeks. Typically, Ms. Haberman would
> request Courthouse Technologies randomly select two hundred jurors to
> serve for the two-week period. Additional jurors were requested if directed
> by the court. The length and type of case had an impact upon the number of
> jurors needed for jury selection.

7. Ms. Haberman understood that selection of jurors from the master jury list required thirty days' notice to allow enough time for random selection and the mailing of the summonses.

8. Ms. Haberman was required to collect the Summons returned to the Kittitas County Superior Court. These included Summons undeliverable and Summons completed and returned by prospective jurors.

9. Ms. Haberman's duties included reviewing the responses from the prospective jurors and excluding persons who no longer resided in Kittitas County, were not citizens of the United States or had been convicted of a felony. She was also authorized by the court to excuse jurors requesting hardship exclusion or deferment. Reasons for hardship exclusion included but were not limited to, age and infirmity, physical health problems ordinarily accompanied by a physician's note or for prescheduled medical appointments.

10. Ms. Haberman would segregate requests for exclusion or deferment into a separate pile. She would respond to each request by printing a mailing label and sending a postcard either granting or denying the juror's request.

11. Ms. Haberman's authority to grant a hardship exclusion was initially granted by Judge Michael Cooper when she was hired as the jury coordinator. The authority and reasons for exclusions were contained in a written document. This written document was not offered into evidence. The written authority continued following appointment of a second Superior Court Judge for Kittitas County and Judge Cooper's later retirement.

12. The defendant's trial was originally scheduled to commence on Tuesday, October 2, 2012. At least thirty days prior to this trial date, Ms. Haberman was instructed to request one hundred additional jurors for the defendant's trial.

13. On October 1, 2012, at 2:12 pm, Ms. Haberman sent an email to deputy prosecuting attorney, Chris Herion and victim/witness coordinator, Shannon Harwood confirming the trial set for the following day for Mr. Mulamba and codefendant Ms. Eli. This was her usual practice for jury trials so that she could record a voice mail message for jurors who were requested to call after 5:00 pm to determine if they should report for jury duty the following day.

14. In the same email, Ms. Haberman advised she had confirmed eighty jurors were expected to report, because of the request for an additional one hundred summonses for the jury pool.

15. Ms. Harwood responded to the Haberman email advising the trial for Mr. Mulamba and Ms. Eli had been rescheduled for October 30th. Ms.

Haberman replied indicating the October 30 jury was a "regular pool size" meaning only two hundred summonses were requested. A minute later, Ms. Haberman emailed Ms. Harwood and Mr. Herion indicating she would be "stingy with excuses" for the trials rescheduled for October 30th because extra summons had not been requested for this jury pool.

16. Mr. Herion responded to this email stream between Ms. Haberman and Ms. Harwood at 3:00 pm on October 1st, advising Ms. Haberman the codefendant, Ms. Eli, had pleaded guilty, however he still needed every available juror to report for the jury pool scheduled for October 30th. Ms. Haberman responded at 3:13 pm advising Mr. Herion there was no time to request more jurors for October 30th and stating; "All request to be excused will be done by the court."

17. The following day, Mr. Herion emailed Ms. Haberman inquiring about rules and deadlines governing when a summons was sent to prospective jurors and the number of summons sent for the October 30 jury pool. Ms. Haberman responded indicating two hundred summonses were requested and sent. The request required thirty days' notice. She also stated; "I have not sent out the cards to excuse for the next pool Oct. 16. 23 and 30. I will go through them again and see if I can pull some from the to be excused pile." She meant by this that she would be more selective in granting hardship requests. She did not recall if she excused any potential juror from the October 30th pool. Her intent was to have the trial court address the hardship requests rather than make the decision herself.

18. Ms. Haberman had no recollection consulting with the presiding judge about her decision to have the court address hardship requests.

19. Ms. Haberman had no recollection of the number of jurors requesting exclusion or pulling some requests from the hardship exclusion pile.

20. Enough jurors reported for jury duty on October 30, 2012 to empanel a jury for the defendant's trial.

21. The defendant was represented by defense counsel, Olvar Klein of Yakima, WA. Mr. Klein was not advised of the email communications between Ms. Haberman, Mr. Herion or Ms. Harwood. The defendant and his lawyers did not receive notice of the email communications until February 2017.

22. Other than the documents filed in this case, there are no other surviving records in paper or electronic formats, including jury summonses, returned summonses, request for hardship or deferment, and the responses to such requests, regarding the jury pool summoned to the jury trial set for October 30, 2012.

23. The Superior Court does not have the court reporter's notes from the hearing on October 30, 2012 (jury selection), thus, a transcript of the jury selection cannot be transcribed.

Order Re Reference Hearing Re Personal Restraint Petition, *In re Personal Restraint of Mulamba,* No. 35087-8-III, at 2-6 (Kittitas County Super. Court, Wash. June 20, 2019).

At the conclusion of the reference hearing, the superior court concluded that the jury selection method used by Kittitas County in 2012 complied with RCW 2.36 and ensured random selection of the jury pool for Mulamba's trial. The court also concluded that the email communications between Laurie Haberman and Chris Herion did not interfere with the 200 persons randomly selected by Courthouse Technologies to receive a jury summons. The court further concluded that Haberman's decision to limit the number or requests for hardship exclusion or to defer those decisions to the court had no prejudicial effect on Mulamba. The court declined to determine whether the communications were ex parte communications or whether they impacted Mulamba's right to a fair trial because those issues were "not material to a determination of the issues" posed by this court. Order Re Reference Hearing Re Personal Restraint Petition, *In re Personal Restraint of Mulamba,* No. 35087-8-III, at 7 (Kittitas County Super. Court, Wash. June 20, 2019

During our second review, pursuant to a personal restraint petition, a majority of this court reversed Denis Mulamba's convictions and remanded for a new trial. *In re*

28

*Personal Restraint of Mulamba*, 15 Wn. App. 2d 1046 (2020). We held that Mulamba was entitled to a jury unanimity instruction on the two charges of assault of a child because of multiple acts of alleged assault against each child presented by the State to the jury. We also held that the State failed to disclose *Brady* material to Mulamba when it failed to disclose jail records of Ashley Eli. Those failures constituted constitutional error that imposed substantial and actual prejudice on Mulamba. We rejected Mulamba's contentions that the constitutional vicinage requirement was violated when the jury was comprised of Kittitas County residents but he was charged with committing assaults in Grant County and that appellate counsel was ineffective for failing to raise the vicinage issue on direct appeal. Because we reversed on other grounds and any error would likely not be repeated, we avoided Mulamba's additional contentions in his personal restraint petition.

The Washington Supreme Court accepted review of our grant of Denis Mulamba's personal restraint petition. The Supreme Court reversed our decision. *In re Personal Restraint of Mulamba*, 199 Wn.2d 488 (2022). The court held that, although the State failed to disclose *Brady* materials, the failure did not prejudice Mulamba. The court also ruled that *Mulamba* was not entitled to a jury unanimity instruction. The Supreme Court, in turn, remanded to this court to address the six contentions raised by Mulamba in his personal restraint petition that we initially avoided.

We quote at length a passage from the Supreme Court opinion because of its

impact on our decision addressing whether the withheld *Brady* material bore relevance to

the sentencing of Denis Mulamba:

> In the present case and important to the materiality factor, Ms. Eli was not the only source of evidence against Mr. Mulamba. Both of Ms. Eli's children testified as to the abuse and identified Mr. Mulamba as their abuser. [Stanley], the older child, testified that Mr. Mulamba hit him on his back and legs and described specific assaults with a heavy belt and with pliers. In addition to identifying Mr. Mulamba in court, [Stanley] was able to identify an approximate timeline of when the assaults occurred. [Jane] was only four years old at the time of the assaults but still identified Mr. Mulamba in court and testified that he was "'[t]he guy who hurt me.'" Resp't's Br., App. 4, at 19 (alteration in original). *While [Jane] never could specifically describe being burned, she did testify that her scars were caused when Mr. Mulamba spanked her.* The court admitted the children's out-of-court interviews in which both children further detailed Mr. Mulamba's abuse.
>
> Testimony from the investigating police officers, doctors, and social workers established that Mr. Mulamba committed the assaults in the time frame alleged by the State. One doctor testified that both children showed evidence of recovering from injuries that had occurred within the previous week. According to medical testimony, the onset of [Jane's] kidney failure likely dated from the same period. The injuries described by the doctors also were consistent with the children's testimony. Neighbors from the apartment building where Mr. Mulamba and Ms. Eli lived testified to seeing the children sent outside in the cold—one neighbor witnessed [Jane] crying outside while Mr. Mulamba berated her. While not conclusive of guilt, DNA (deoxyribonucleic acid) evidence tied both Mr. Mulamba and [Jane] to an iron and a cord allegedly used to inflict the injuries.
>
> The limited evidence presented at trial that tended to exonerate the defendant was Mr. Mulamba's own testimony, in which he shifted blame for the major assaults to Ms. Eli and admitted only to isolated incidents of slapping each child. This defense is countered by the State's extensive evidence. Even if Ms. Eli's testimony were removed entirely, the remaining evidence supports the jury verdict.
>
> In contrast to the wealth of evidence indicating Mr. Mulamba's guilt, the withheld jail reports relate to Ms. Eli's bad behavior, including possible

30

dishonesty and mental health problems. The records' relevance was to Ms. Eli's honesty and the credibility of her testimony. However, Ms. Eli's tendency to lie was not only raised on cross-examination but was a theme throughout the entire trial. *Moreover, nothing in the jail records supports the defense theory that Ms. Eli committed the serious offenses against the children.*

During her testimony, Ms. Eli admitted that she had lied to the police about hitting her children. She additionally admitted to delaying medical treatment for the children when she believed the police would blame her for their injuries. Ms. Eli's children's statements (both during the trial and in interviews) further supported Ms. Eli's lack of candor: neither child would initially name their abuser because Ms. Eli told them not to. She pleaded guilty to criminal mistreatment charges; the jury was informed of her plea.

As for Ms. Eli's mental health, the defense focused on Ms. Eli's "crazy" behavior throughout the trial, to the point of claiming "[c]razy Ashley [sic]" was the actual perpetrator of the abuse. RP (Nov. 9, 2012) at 1131. Neither party contested that Ms. Eli had been somewhat untruthful and may have suffered from mental illness. During closing statements, the prosecutor characterized Ms. Eli as "crazy" [three] times, "nuts" once, and "pea brain[ed]" once. RP (Nov. 9, 2012) at 1083, 1094. The prosecutor additionally referred to Ms. Eli as "crazy" [five] times when cross-examining Mr. Mulamba. RP (Nov. 8, 2012) at 958, 960, 965, 992. The defense counsel, meanwhile, used "crazy" [eleven] times and "nuts" [seven] times when referring to Ms. Eli in closing statements. RP (Nov. 9, 2012) at 1099-1131.

While the undisclosed jail records may have further impeached Ms. Eli on these issues, Ms. Eli's already heavily impeached testimony was not the only basis for the State's case against Mr. Mulamba. Testimony presented by other witnesses—particularly the child victims—provided evidence for the jury to reasonably find Mr. Mulamba guilty.

Ms. Eli's testimony did not form the sole basis for the State's case. The evidence presented at the trial was substantial and supported the jury's guilty verdict: *the child victims consistently testified that Mr. Mulamba was the person who hurt them, witnesses testified to behavior and observations consistent with Mr. Mulamba committing the assaults, and medical and forensic evidence supported Mr. Mulamba's guilt.* Given all of the other evidence, additional reports—especially when those reports are of questionable admissibility—of Ms. Eli's bad jailhouse behavior and depression do not undermine confidence in the jury's verdict.

The undisclosed *Brady* material did not establish a reasonable
probability that the trial would have turned out differently had the material
been disclosed.

*In re Personal Restraint of Mulamba*, 199 Wn.2d 488, 504-07 (2022) (emphasis added)

(footnote omitted) (alterations in original).

## LAW AND ANALYSIS

### PRP Standard

We first outline procedural rules for a personal restraint petition. A restraint

petition is not a substitute for a direct appeal, and the availability of collateral relief is

limited. *In re Personal Restraint of Dove*, 196 Wn. App. 148, 153, 381 P.3d 1280 (2016).

Relief by way of a collateral challenge to a conviction is extraordinary, and the petitioner

must meet a high standard before this court will disturb an otherwise settled judgment. *In

re Personal Restraint of Coats*, 173 Wn.2d 123, 132, 267 P.3d 324 (2011).

RAP 16.4(c) lists seven grounds for relief by way of a personal restraint petition.

Only two of the grounds, found in subsubsections (2) and (3), possibly apply.

> (c) Unlawful Nature of Restraint. The restraint must be unlawful for
> one or more of the following reasons:
> . . . .
> (2) The conviction was obtained or the sentence or other order
> entered in a criminal proceeding . . . was imposed or entered in violation of
> the Constitution of the United States or the Constitution or laws of the State
> of Washington; or
> (3) Material facts exist which have not been previously presented and
> heard, which in the interest of justice require vacation of the conviction,
> sentence, or other order entered in a criminal proceeding.

We focus first on RAP 16.4(c)(2). Subsubsection (c)(2) does not expressly require the petitioner to show prejudice if he or she shows a violation of the federal or state constitution or other Washington law. Case law, however, grafts this requirement at least when the petitioner previously had the opportunity to raise the violation of law. RAP 16.4(c)(2) also does not distinguish between a violation of a constitutional dictate or a state statute. Case law makes such a distinction. According to Washington Supreme Court precedent, to prevail in a personal restraint petition, a petitioner generally must establish (1) a constitutional error that resulted in actual and substantial prejudice, or (2) a fundamental defect of a nonconstitutional nature that inherently resulted in a complete miscarriage of justice. *In re Personal Restraint of Coats*, 173 Wn.2d 123, 132-33 (2011); *In re Personal Restraint of Dove*, 196 Wn. App. 148, 154 (2016). Presumably a complete miscarriage of justice ensues only if the petitioner suffers prejudice. Case law labels these two standards as the heightened standard.

In an exception to the heightened personal restraint petition standard, a petitioner who had no earlier opportunity for direct judicial review of a claimed error need not fulfill the heightened standard of review for a personal restraint petition. *In re Personal Restraint of Stuhr*, 186 Wn.2d 49, 52, 375 P.3d 1031 (2016); *In re Personal Restraint of Lain*, 179 Wn.2d 1, 10, 315 P.3d 455 (2013). This leaner standard applies when the petitioner could not have presented the ground for relief on direct appeal because the facts supporting the ground were not in the record. *State v. Sandoval*, 171 Wn.2d 163, 169,

249 P.3d 1015 (2011). In such an event, the petitioner need only show that his restraint is unlawful under one or more of the criteria identified in RAP 16.4(c). *In re Personal Restraint of Stuhr*, 186 Wn.2d 49, 52 (2016). The petitioner need not show actual and substantial prejudice nor a fundamental defect that inherently resulted in a complete miscarriage of justice. This lower standard echoes the standard on direct review.

Juror Selection Process

We move to the discrete assignments of error forwarded by Denis Mulamba in his petition. As part of his personal restraint petition, Denis Mulamba faults the process employed by Kittitas County Superior Court jury coordinator Laurie Haberman when summoning citizens for jury duty at Mulamba's trial. We apply the lesser standard for a personal restraint petition review to his complaint about juror selection because Mulamba did not know of the clerk's actions before the cessation of his appeal. We principally ask whether Haberman violated the law during the process for summoning jurors for Mulamba's trial. We conclude she did not.

Denis Mulamba highlights that jury coordinator Laurie Haberman, after consultation with the deputy prosecutor, reviewed the list of potential jurors again and pulled some names from the excusal pile. According to Mulamba, venire people appeared for jury selection who may not have appeared had the coordinator not modified her original decision of excusal after the prosecutor's ex parte input. Mulamba contends this process violated the randomness of jury selection demanded by both statute, RCW

2.36.080, the Sixth and Fourteenth Amendment of the United States Constitution, and

article I, sections 3, 12, 21, and 22 of the state constitution. RCW 2.36.080(1) declares:

> (1) It is the policy of this state that all persons selected for jury service be selected at random from a fair cross section of the population of the area served by the court, and that all qualified citizens have the opportunity in accordance with chapter 135, Laws of 1979 ex. sess. to be considered for jury service in this state and have an obligation to serve as jurors when summoned for that purpose.

The jury-selection statutes repeatedly mandate random selection of a jury panel.

*Brady v. Fibreboard Corp.*, 71 Wn. App. 280, 282, 857 P.2d 1094 (1993). The trial court

must ensure random selection. *Brady v. Fibreboard Corp.*, 71 Wn. App. 280, 282 (1993).

But the statutory demands for compiling jury lists are merely directory to which only

substantially compliance is required. *City of Tukwila v. Garrett*, 165 Wn.2d 152, 159,

196 P.3d 681 (2008). No single method of jury selection is required so long as the

method chosen preserves the element of chance. *State v. Tingdale*, 117 Wn.2d 595, 600,

817 P.2d 850 (1991). An individual does not have the right to a particular juror or jury.

*State v. Gentry*, 125 Wn.2d 570, 615, 888 P.2d 1105 (1995).

Prejudice will be presumed only if there is a *material* departure from the statutory

requirements. *City of Tukwila v. Garrett*, 165 Wn.2d 152, 161, 196 P.3d 681 (2008). If

there is substantial compliance with the statute, then a challenger may claim error only if

he or she establishes actual prejudice. *City of Tukwila v. Garrett*, 165 Wn.2d 152, 161

(2008).

The Washington Supreme Court observed with respect to jury selection:

The purpose of all these statutes is to provide a fair and impartial jury, and if that end has been attained and the litigant has had the benefit of such a jury, it ought not to be held that the whole proceeding must be annulled because of some slight irregularity that has had no effect upon the purpose to be effected.

*W.E. Roche Fruit Co. v. Northern Pacific Railway Co.*, 18 Wn.2d 484, 488, 139 P.2d 714 (1943).

Denis Mulamba's complaint about Laurie Haberman's process begins with her unilaterally allowing hardship exceptions. Courts have broad discretion to excuse jurors. RCW 2.36.100 provides a list of reasons a person may be excused from jury service, including "any reason deemed sufficient by the court." RCW 2.36.100(1). The court may delegate the task of excusing prospective jurors to the court clerk. *State v. Rice*, 120 Wn.2d 549, 561, 844 P.2d 416 (1993); *State v. Langford*, 67 Wn. App. 572, 584, 837 P.2d 1037 (1992). In the end, however, Haberman returned to the jury pool individuals she initially planned to excuse such that the trial court would make decisions on hardship excusals.

We review a series of Washington decisions, some of which Denis Mulamba forwards in support of his contention that Laurie Haberman's actions reduced randomness and violated the law. In *State v. Tingdale*, 117 Wn.2d 595 (1991), the Jefferson County clerk followed a procedure whereby, if she knew a potential juror was a close friend of the defendant or knew the defendant well, the clerk would not summon the person for jury duty. While the clerk was on vacation, the deputy clerk summoned a pool of jurors.

When the clerk returned, the clerk notified the superior court of her belief that three jurors in the pool knew the defendant, Susan Tingdale. The superior court did not ask the clerk to identify the jurors or attempt to question them regarding knowledge of Tingdale. The court instead, while relying on the clerk's judgment, directed her to excuse the individuals.

On appeal, in *State v. Tingdale*, Susan Tingdale claimed the superior court denied her the right to a fair trial by an impartial jury when it unilaterally allowed the clerk to excuse three members of the jury panel based on their acquaintance with her. The Washington Supreme Court agreed, finding the trial court's procedure did not substantially comply with the statute. The Court noted that the practice allowed the judge, and even the clerk, to assemble a jury panel of their own choosing, violating the statutorily required element of chance and calling into doubt the impartiality of the selected jury. A juror's acquaintance with a party, by itself, was not grounds for a challenge for cause. Accordingly, the procedure utilized by the court constituted a material departure from the statute and prejudice was presumed. The court also noted that, by rejecting qualified persons, Tingdale was forced to accept other, possibly "unqualified" jurors.

In *State v. Rice*, 120 Wn.2d 549 (1993), Herbert Rice contended that Yakima County failed to follow the statutory requirements for jury selection when the clerk, not the judge, excused several prospective jurors for hardship and other personal excuses.

37

The Supreme Court held that a court may delegate this task when the court provides detailed procedures to the clerk's office to follow when excusing a prospective juror. The court also noted that, unlike in *State v. Tingdale*, Rice failed to show that individuals who might have been favorable to him were systematically excluded. Although Rice noted a few isolated excuses of potential jurors that appeared questionable, he failed to demonstrate a gross departure from the statute or the county's guidelines and failed to demonstrate prejudice.

In *State v. Langford*, 67 Wn. App. 572 (1992), three defendants challenged the jury selection process on the basis that the clerk, on request, automatically excused potential jurors in certain occupational groups. The assistant county clerk testified that she utilized guidelines developed by the superior court and entombed in a judge's memorandum, under which she automatically excused health care providers and key personnel indispensable to the operation of a business. If a teacher asked for an excuse during the school year, the assistant clerk also automatically granted the request. This court upheld as constitutional a practice of excusing identified occupations when a master list identified the occupations and a member of a group needed to affirmatively call and request an exemption. Moreover, when the assistant clerk acted within guidelines prepared by the superior court and consistent with RCW 2.36.100, jury selection conformed with law.

This court found a material violation of the jury selection statutes in *Brady v. Fibreboard Corp.*, 71 Wn. App. 280 (1993). That case involved an asbestosis action against several defendants. Prior to trial, the superior court mailed questionnaires asking ninety potential jurors about their views on cancer and asbestos. Two judges, neither who presided over the trial, used the responses to the questionnaire to remove jurors they deemed unqualified. Those venire people were directed not to report for trial. The plaintiff's counsel objected to the selection procedure but was overruled. The plaintiff subsequently moved for a new trial on the basis that the jury selection process had been flawed. The trial court denied the motion. On appeal, this court concluded that the procedures used by the judges abridged the statutory mandate of random selection because, although the initial panel of ninety was randomly selected, that randomness was destroyed when certain jurors were eliminated by the process. The court further concluded that the procedures abridged the statutory procedures that govern challenges for cause because this process was the functional equivalent of granting fourteen challenges for cause on grounds of actual bias and this process denied the plaintiff her right to be heard on the question of actual bias and her right to have the existence of actual bias determined by the trial judge. Since the process constituted a material violation of the statute, prejudice was presumed and the court remanded for a new trial.

More recently, this court considered whether the jury selection process for a civil trial held during the COVID-19 pandemic departed from the statutory requirements in

*Budd v. Kaiser Gypsum Co.*, 21 Wn. App. 2d 56, 505 P.3d 120 (2022), *review denied*, 199 Wn.2d 1030, 514 P.3d 640 (2022). After jury trials resumed during the pandemic, the King County Superior Court, in line with a directive from the Washington Supreme Court, allowed for the excusal of potential jurors at higher risk from COVID-19 based on their age or health conditions. The potential juror needed to apply for the excusal. The King County Superior Court jury services department sent summonses only to one thousand potential jurors who had deferred service before. The department then sent juror questionnaires only to those people who responded to the summons. Apparently, the jury pool for selection by the parties was limited to those who responded to questionnaires. The jury entered a verdict of $13.5 million on Raymond Budd's claim for contracting mesothelioma from Kaiser Gypsum's product.

On appeal, in *Budd v. Kaiser Gypsum Co.*, Kaiser Gypsum argued that the trial court erred by failing to ensure the jury pool was sufficiently random under RCW 2.36 in part because of limiting the venire to those who had deferred service before and to those who completed the questionnaire. Kaiser Gypsum also contended that the excusal of persons age sixty or above also impaired randomness.

This court rejected Kaiser Gypsum arguments because the company failed to show the jury pool was less random because of limiting the jurors to those who deferred service before. A juror might defer service for a variety of reasons. Winnowing jurors further by a response to a summons also did not destroy the random nature of juror selection.

Finally, this court rejected Kaiser Gypsum's objection to a purported constructive exclusion of people ages sixty and older. The court noted that, for an exclusion to be unconstitutional, it must be "systematic." Kaiser Gypsum cited no case law holding that "constructive" exclusion is sufficient. Under King County Superior Court policy, no identifiable group was automatically excluded because those sixty years or older were excluded only if they wished not to report for duty.

The difference between the facts in the personal restraint petition and all other cases is that the clerk's jury coordinator returned citizens to the jury pool rather than removed them. Also, instead of exercising her authority in whether to grant a hardship request, the coordinator returned the decision to the superior court judge. The clerk's conduct increased the randomness of jury selection, rather than decreased randomness.

Denis Mulamba fails to show any exclusion of a particular class or citizen, any weighting of the jury list, or the jury list failing to represent a cross section of the community. He does not assert that the composition of the jury list venire or jury entailed any inherent bias or prejudice. He does not argue that the process denied him his right to challenge any juror. Nothing in the record indicates that jurors who would normally have been excused by Laurie Haberman were not ultimately excused by the court for hardship exemptions or that Mulamba was otherwise prejudiced by having the judge make these determinations rather than Haberman. The superior court, during the reference hearing,

41

correctly concluded that the court did not materially depart from the jury selection statutes.

Denis Mulamba emphasizes that unlike *Rice*, Haberman could not produce any specific guidelines on which she relied, other than the statutory factors, when granting exemptions. He argues that Haberman's testimony established an inconsistency in her decisions. For example, she did not always uniformly excuse people based on age. These arguments might be sound except that Mulamba did not establish that Lauri Haberman employed any inconsistencies at his trial.

Denis Mulamba also argues that Laurie Haberman's actions constitute a material departure from the statute because she refrained from granting exemptions to try to keep the pool size large, based on a mistaken belief that she could not send summonses less than thirty days before trial. Mulamba highlights that RCW 2.36.130 authorizes the court to issues summonses with less than thirty days' notice. RCW 2.36.130 provides:

> If for any reason the jurors drawn for service upon a jury for any term shall not be sufficient to dispose of the pending jury business, or where no jury is in regular attendance and the business of the court may require the attendance of a jury before a regular term, the judge or judges of any court *may direct* the random selection and summoning from the master jury list such additional names as they may consider necessary.

(Emphasis added.)

We conclude that Laurie Haberman did not violate the statute. The superior court at Denis Mulamba's trial did not need to seek additional jurors. Moreover, the statute is permissive rather than mandatory. Haberman could have asked the court to utilize this

option, but the statute did not require such a request. Haberman's failure to do so cannot be labeled a material departure from the statute.

We express concern about the jury coordinator contacting the deputy prosecuting attorney for input without entering defense counsel into the discussion. We also express concern that the jury coordinator discussing the jury selection in a particular criminal proceeding without the defendant present and outside an open court may violate constitutional requirements for an open court. Nevertheless, Denis Mulamba limits his challenge to the randomness of the jury pool.

*Brady* Material for Sentencing

This court previously ruled that the State withheld documents relevant to the guilt or innocence of Denis Mulamba and such withholding prejudiced Mulamba. As part of his initial submission, Mulamba also contended that the withheld records interfered in his ability to advance his interests during sentencing. We avoided this contention since we remanded for a new trial. Now that the Supreme Court has agreed that the records were favorable to Mulamba, but not material to Mulamba's defense, we must decide if those records were material to Mulamba's sentencing. Based on the reasoning behind the Supreme Court's decision, we conclude that the records also lacked importance for purposes of sentencing.

Denis Mulamba emphasizes that the same judge who presided over his jury trial conducted his sentencing. More importantly, the same judge sentenced Ashley Eli days

earlier. Because of the withholding of the jail records, the sentencing court considered Eli a polite woman, who admitted her complicitly in the harm to her children, who claimed the desire to learn from her experience, and who thanked the judge for the judge's righteous rulings. During Eli's sentencing, the prosecutor thanked Eli for her testimony, indicated that Eli had taken responsibility for her role in the offense, and stated that her response and his interactions with her had been appropriate. The prosecutor did not inform the judge that Eli wreaked havoc in jail, that she was uncooperative with officers during transport, that she faked a suicide attempt shortly before her sentencing, and that the jail, on the morning of the sentencing, was concerned about her "recent behaviors." The sentencing court only imposed a ten-year sentence on Eli, when the court could have imposed fifteen years. When imposing the sentence, the court criticized Eli for a delay in seeking assistance for her children but also indicated that the court sympathized with her. The court thanked her for seeking medical attention for the children, suggested that her loyalty to a "man" was responsible for the delay, but that she ultimately did the right thing.

During Denis Mulamba's sentencing, a question arose as to who burned Jane. According to Mulamba, the only one who testified that Mulamba burned Jane was Ashley Eli. Jane did not so testify. The State argued Mulamba should receive an exceptionally long sentence based in part on the burning, but the defense objected and argued the court should not sentence Mulamba for that act. In his allocution, Mulamba denied that he

burned a child.  In response during sentencing, the State argued Eli testified before the jury, the jury enjoyed the opportunity to determine Eli's credibility, and the jury could discern whether Eli was "nuts" when claiming Mulamba burned J.R.  In reply, Mulamba contended the State did not disclose what it actually knew about Eli's mental health issues at the jail, her persistent jail misbehavior, and acts of dishonesty, such that the jury did not hear all relevant evidence when assessing who burned Jane.

Denis Mulamba's argument continues.  According to Mulamba, contrary to the sentence meted against Eli, the sentencing court "threw the book at him."  The court found substantial and compelling reasons for imposing maximum sentences for Mulamba based on her determination that he exploited Eli's inability to protect her children. Mulamba protests that knowledge of Eli's conduct in jail would have altered the sentencing judge's views of Eli and him and could have led to a harsher sentence against Eli and a lesser sentence against him.

With Denis Mulamba's arguments in mind, we briefly review the law and proceed to analyze the contentions.  According to the United States Supreme Court, due process demands that the prosecutor disclose evidence that would not only bear on the guilt or innocence of the accused, but also impact a defendant's sentence.  *Brady v. Maryland*, 373 U.S. 83, 87-88, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).  The government has the obligation to turn over evidence in its possession that is both favorable to the accused and material to guilt or punishment.  *Pennsylvania v. Ritchie*, 480 U.S. 39, 57, 107 S. Ct. 989,

94 L. Ed. 40 (1987). The prosecutor must make sure during sentencing that all information in his or her possession material to punishment and favorable to the accused is presented to the court and that the sentence is not based on mistakes of fact or faulty information. *United States v. Doe*, 655 F.2d 920, 928 (9th Cir. 1980); *United States v. Malcolm*, 432 F.2d 809, 818 (2d Cir. 1970). Even if the sentencing court would reduce the offender's sentence only by a few weeks if the court had the added information, the offender suffers prejudice. *Glover v. United States*, 531 U.S. 198, 203, 121 S. Ct. 696, 148 L. Ed. 2d 604 (2001).

A *Brady* violation consists of three components, (1) the evidence must be favorable to the accused, (2) the State must have suppressed the evidence, and (3) prejudice must have ensued. *Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999); *In re Personal Restraint of Stenson*, 174 Wn.2d 474, 486-87, 276 P.3d 286 (2012). We focus on the third element.

In the context of the third *Brady* prong, "materiality" and "prejudicial" mean the same. Evidence is not material unless it is prejudicial and not prejudicial unless it is material. *Benn v. Lambert*, 283 F.3d 1040, 1053 n.9 (9th Cir. 2002). Evidence is material and must be disclosed by the State if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *Kyles v. Whitley*, 514 U.S. 419, 433, 115 S. Ct. 1555, 131 L. Ed. 2d 490

(1995); *United States v. Bagley*, 473 U.S. 667, 679-80, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985).

In *In re Personal Restraint of Mulamba*, 199 Wn.2d 488, 503-04 (2022), the Washington Supreme Court adopted a line of federal cases that hold cumulative material that harms a witness's credibility to be nonprejudicial. The court refused to consider that, although some impeaching evidence may not taint the jury's view of the witness, more impeaching evidence could sway the jury to reject the witness's testimony.

Denis Mulamba forwards excellent arguments. We agreed with similar arguments when addressing whether Mulamba should receive a new trial. Nevertheless, the Supreme Court reversed us on the basis that the undisclosed information was not material. Since Mulamba either forwards the same or similar arguments with regard to sentencing, we conclude the Supreme Court would reject the same arguments in this new context of sentencing. The high court would readily reverse us again. We are bound by Supreme Court precedent and rulings.

Denis Mulamba emphasizes that the sentencing court must have relied on Ashley Eli's attribution to him of the harm to the children because the court issued a higher sentence on him. Mulamba also argues that the jury relied on Ashley Eli's testimony accusing him with criminal behavior. Nevertheless, the Supreme Court has answered that both children, in addition to Eli, testified to Mulamba being the principal, if not sole, abuser. In his argument relating to sentencing, Mulamba emphasizes the lack of

47

testimony directly charging him with burning Jane. But he argued the same before the Supreme Court. The Supreme Court responded that, although Jane could not recall being burned, she still testified that Mulamba, not her mother, scarred her. Testimony from the health care professionals attributed all of the recent injury on the children to Mulamba. The only evidence that exonerated Mulamba was his own testimony.

During trial, Denis Mulamba's attorney repeatedly attacked the credibility of Eli. Eli admitted to lying to law enforcement. During argument, the State characterized Eli as "crazy." The sentencing court would have heard all of this evidence during the guilt phase of the proceeding. None of the withheld jail records support Mulamba's theory that Eli committed the serious offenses against the children.

The Supreme Court held that the undisclosed jail records did not establish a reasonable probability that the jury would have acquitted Denis Mulamba. For the same reasons, we conclude that the undisclosed jail records do not establish a reasonable probability that the sentencing court would have lowered Mulamba's sentence.

Ineffective Assistance of Counsel

Denis Mulamba next contends that his trial counsel performed ineffectively when failing to discover and use the jail records to Mulamba's advantage during trial. Because the Supreme Court held that the records lacked materiality for purposes of the guilt phase of the trial and we deduce that the same holding applies to sentencing, we reject this contention because Mulamba cannot establish any error by counsel prejudiced him.

To prevail on a claim of ineffective assistance, the petitioner must show that counsel's performance fell below an objective standard of reasonableness and that the deficient performance actually prejudiced him. *In re Personal Restraint of Morris*, 176 Wn.2d 157, 166, 288 P.3d 1140 (2012) (plurality opinion). The burden to establish prejudice for a claim of ineffective assistance is the same in a personal restraint petition as on direct appeal. *In re Personal Restraint of Crace*, 174 Wn.2d 835, 847, 280 P.3d 1102 (2012). A defendant is prejudiced when there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *In re Personal Restraint of Crace*, 174 Wn.2d 835, 840 (2012). To prevail on a claim of ineffective assistance of appellate counsel, petitioner must show how she was prejudiced. *In re Personal Restraint of Netherton*, 177 Wn.2d 798, 801, 306 P.3d 918 (2013).

Denis Mulamba astutely relies on a Ninth Circuit opinion that holds, to the extent defense counsel's failure to request the prison file was a cause of the state's failure to disclose it, that failure constituted ineffective assistance of counsel. *Carriger v. Stewart*, 132 F.3d 463, 479 (9th Cir. 1997). Nevertheless, assuming for argument's sake that counsel performed deficiently, Mulamba must still show the negligence caused him prejudice. For the same reason that we conclude that withholding of the jail records by the State did not prejudice Mulamba, we conclude that counsel's failure to demand the records did not harm Mulamba. The Supreme Court has ruled the records to be unimportant to Mulamba.

49

Exceptional Sentence

The jury returned guilty verdicts on all four counts charged and also returned special verdicts on aggravating circumstances on three of the four counts. As to first degree child assault of Jane, second degree child assault of Stanley, and first degree criminal mistreatment of Jane, the jury answered "yes" to the question of whether Mulamba knew or should have known that the victim of the offense was particularly vulnerable or incapable of resistance. In turn, the sentencing court, based on the special verdicts, imposed an exceptional sentence by running each of the three counts consecutively. In doing so, the sentencing court concluded that substantial and compelling reasons justified the exceptional sentence. The aggravated sentence totaled forty years.

Denis Mulamba claims five errors infected the imposition of the exceptional sentence. First, the sentencing court failed to enter written findings supporting the exceptional sentence. Second, the record does not support the alleged facts on which the sentencing court based its sentence. Third, substantial and compelling reasons do not support an exceptional sentence. Fourth, grounds on which the sentencing court based the sentence inhere in the convictions. Fifth, the sentencing court's finding of substantial and compelling reasons violated his right to a jury trial. Mulamba asks that this court vacate the exceptional sentences and direct resentencing within a standard range sentence, presumably sentences that run concurrently. Alternatively, Mulamba asks that this court

remand the case to Kittitas County Superior Court for entry of written findings and conclusions.

*Written Findings*

Denis Mulamba next contends that the superior court must resentence him because the court failed to enter written findings of fact when entering an exceptional sentence. The State asks us to decline to examine this contention because Mulamba waived the argument by failing to assert it on direct appeal. The State first asserted waiver in its second supplemental brief. Therefore, Mulamba maintains, in response, that the State waived the defense of waiver. We agree with Mulamba.

This court will generally not address arguments raised for the first time in a supplemental brief and not made originally by the petitioner or respondent within the petition. *Cummins v. Lewis County*, 156 Wn.2d 844, 851, 133 P.3d 458 (2006). The State offers no reason for failing to raise this argument until five years after Denis Mulamba filed his restraint petition. The State furnishes no authority supporting its assertion that the court should deem this assignment of error waived when Mulamba also asserts appellate counsel was ineffective for failing to raise this claimed error on direct appeal. Accordingly, we move to the merits of Mulamba's assignment of error for lack of written findings.

Before analyzing the need for written findings of fact, we outline the law behind aggravating or exceptional sentences. The SRA authorizes exceptional sentences above

51

the standard range in certain circumstances. RCW 9.94A.535. An offender sentenced for more than one crime at the same time will presumptively serve concurrent sentences, but, under RCW 9.94A.589, the court may impose consecutive sentences under the exceptional sentence provisions of RCW 9.94A.535. *State v. Flake*, 76 Wn. App. 174, 182, 883 P.2d 341 (1994).

One basis for an exceptionally long sentence is vulnerable victims. The fact that the "defendant knew or should have known that the victim of the current offense was particularly vulnerable or incapable of resistance" is an aggravating circumstance that can support a sentence above the standard range. RCW 9.94A.535(3)(b).

The sentencing reform act contemplates a two-step process, beginning with jury involvement.

> The facts supporting aggravating circumstances shall be proved to a jury beyond a reasonable doubt. The jury's verdict on the aggravating factor must be unanimous, and by special interrogatory.

RCW 9.94A.537(3).

After a jury finding, the sentencing court enters the process. For a court to impose a sentence outside the standard range, the court must find "substantial and compelling reasons" in addition to the jury finding of the facts supporting the aggravating factor, RCW 9.94A.535; RCW 9.94A.537(6). Once the jury by special verdict finds that the State proved aggravating circumstances beyond a reasonable doubt, the trial judge is left only with the legal conclusion of whether the facts alleged and found were sufficiently

substantial and compelling to warrant an exceptional sentence. *State v. Suleiman*, 158 Wn.2d 280, 290-91 n.3, 143 P.3d 795 (2006); *State v. Sage*, 1 Wn. App. 2d 685, 708, 407 P.3d 359 (2017).

Denis Mulamba highlights that the sentencing judge, during an oral ruling, delivered findings for the exceptional sentence, but she never entered any written findings and conclusions. Instead, the sentencing court attached the special verdict forms to the judgment. Although the special verdict forms include the finding of vulnerable victims incapable of resistance, the forms do not contain the essential finding of substantial and compelling reasons for an exceptional sentence. According to Mulamba, the absence of written findings impedes appellate review. The State responds, in part, that the sentencing court's oral ruling was "exceptional" in that the court thoroughly and astutely reviewed the facts and the law.

RCW 9.94A.535 requires the sentencing court to give its reasons for imposing an exceptional sentence in written findings. The statute declares in part:

> Whenever a sentence outside the standard sentence range is imposed, the court shall set forth the reasons for its decision in written findings of fact and conclusions of law.

Denis Mulamba relies on this statute. A trial court's failure to make written findings of fact required by RCW 9.94A.589 is a nonconstitutional error. *In Re Personal Restraint of Finstad*, 177 Wn.2d 501, 507-08, 301 P.3d 450 (2013).

In many settings, Washington appellate courts accept thorough oral findings as a substitute for written findings of fact. For example, despite CrR 3.6(b) demanding written findings of fact to support a suppression motion hearing, Washington appellate courts do not strictly enforce the rule. *State v. Weller*, 185 Wn. App. 913, 923, 344 P.3d 695 (2015). Nevertheless, the Supreme Court in *State v. Friedlund*, 182 Wn.2d 388, 341 P.3d 280 (2015), overruled decisions of this court permitting extensive oral findings to substitute for written findings of fact required for exceptional sentences. The Supreme Court wrote:

> We hold that the entry of written findings is essential when a court imposes an exceptional sentence. . . .
> . . . This requirement, word for word, has been part of the SRA from its inception. The written findings must then be sent to the Washington State Sentencing Guidelines Commission along with the trial court's judgment and sentence. . . .
> We hold that the SRA's written findings provision requires exactly that—*written* findings. Permitting verbal reasoning—however comprehensive—to substitute for written findings ignores the plain language of the statute. It would also deprive defendants of the finality accorded by the inclusion of written findings in the court's formal judgment and sentence. "A trial court's oral or memorandum opinion is no more than an expression of its informal opinion at the time it is rendered. It has no final or binding effect unless formally incorporated into the findings, conclusions, and judgment." A written judgment and sentence, by contrast, is a final order subject to appeal. . . .
> Allowing courts to ignore the written findings requirement would also run contrary to the SRA's explicit statutory purpose of "mak[ing] the criminal justice system accountable to the public." Without written findings, the Sentencing Guidelines Commission and the public at large could not readily determine the reasons behind exceptional sentences, greatly hampering the public accountability that the SRA requires.

*State v. Friedlund*, 182 Wn.2d 388, 393-95 (2015) (alteration in original) (citations omitted) (footnote omitted). *State v. Friedlund* involved two discrete cases, in which the superior court failed to enter written findings. The Supreme Court remanded both cases to the trial court to enter those findings and conclusions.

*State v. Friedlund* involved direct review of sentences. In *In re Personal Restraint of Finstad*, 177 Wn.2d 501 (2013), the Supreme Court adopted a different rule for personal restraint petitions. A petitioner challenging an exceptional sentence based on the sentencing court's failure to enter written findings of fact is not automatically entitled to a remand for entry of written findings. Instead, the restraint petitioner must show prejudice from the claimed error.

*In re Personal Restraint of Finstad* encompasses unique facts. Lowell Deray Finstad faced seven felony charges. After he was convicted by a jury on two of the charges, he and the State negotiated a global plea agreement on the remaining charges. The agreement resulted in less prison time for Finstad then if he had been convicted of all charges. In exchange, Finstad agreed to dismiss his appeal of his jury convictions. Under the agreement, most of the sentences would run concurrently. The State, however, reserved the right to ask the sentencing court to run a sentence for delivery of a controlled substance conviction consecutive to the others. Neither of the parties nor the court realized that a consecutive sentence constituted an exceptional sentence and required special findings. The sentencing court accepted the pleas and the State's sentencing

recommendation without entering any written findings justifying the partial consecutive sentence. Finstad did not appeal. Three years later, Finstad filed his personal restraint petition. He argued that he received an exceptional sentence that did not comply with the requirement of written findings. He asked this court to order the sentences be served concurrently.

Before the Supreme Court, Lowell Finstad argued he need not meet the traditional standard, for a personal restraint petition, of substantial prejudice due to a constitutional error or a complete miscarriage of justice due to a nonconstitutional error because the lack of written findings resulted in the entry of an exceptional sentence without authority of law. The Supreme Court disagreed. The Supreme Court characterized the lack of written findings as a nonconstitutional error. Accordingly, the court applied the traditional rule that required a showing of a complete miscarriage of justice, not simply an invalid sentence. Even assuming the error expanded to constitutional magnitude, Finstad still needed to show actual and substantial prejudice flowing from that error. Since the court could have avoided error by scheduling sentencing on different days, such that no exceptional sentence was needed to run sentences consecutively, Finstad did not show substantial error. The Supreme Court also emphasized that, without the plea agreement, Finstad could have faced a longer aggravated sentence, even without consecutive sentences, if convicted of the numerous crimes. The court noted the principle that

a global plea agreement is a contract and a petitioner cannot seek to invalidate only a portion of it.

We must decide whether to employ the lower standard of review controlling direct review, as utilized in *State v. Friedlund*, or the higher standard generally applicable to restraint petitions, as applied in *In re Personal Restraint of Finstad*, when analyzing the sentencing court's failure to enter written findings. Denis Mulamba contends he need not show the lack of written findings caused prejudice because his appellate counsel performed ineffectively when failing to raise the issue on direct appeal. He cites no authority for this proposition. We note that, to sustain a claim of ineffective assistance of counsel, Mulamba must establish prejudice, not simply a violation of law. *In re Personal Restraint of Netherton*, 177 Wn.2d 798, 801 (2013). If we agreed with Mulamba's contention, Mulamba would avoid the element of prejudice despite asserting ineffective assistance of counsel.

We conclude that Denis Mulamba must show prejudice resulted from the lack of written findings of fact and he has failed to carry this burden. A remand to the sentencing court could have corrected the error. Mulamba does not show that any remand would have likely resulted in a reduction of his sentence.

In an attempt to successfully argue that this court should remand for a new resentencing despite a failure to show prejudice, Denis Mulamba distinguishes *In re Personal Restraint of Finstad* because Lowell Finstad received the very consecutive

sentence for which he bargained in his plea agreement.  We agree with Mulamba's

reading of *Finstad*, but conclude the Supreme Court would have denied the personal

restraint petition of Lowell Finstad without the agreement.  The high court grounded its

decision on the nature of a restraint petition.

*Sufficiency of Evidence for Findings*

Denis Mulamba further argues that the record does not support some of the factual

findings declared by the sentencing court during its oral ruling.  According to Mulamba,

the sentencing court erred when articulating that medical professionals cried at trial, that

nighttime assaults render a child more vulnerable, that both children will suffer lifelong

emotional effects, and that Stanley will suffer permanent scarring.

Denis Mulamba's contention auguries a thicket of misunderstanding resulting from

misguided usage of the word "findings" by the legislature in the sentencing statute.  A

series of statutory amendments and Washington cases have addressed the process needed

to impose an exceptional sentence consistent with a defendant's constitutional right for

factfinding by the jury rather than the court.  RCW 9.94A.537(3) directs that the facts

supporting aggravating circumstances be proved to a jury beyond a reasonable doubt.

The jury's verdict on the aggravating factor must be unanimous, and by special

interrogatory.  RCW 9.94A.537(6) provides that if a jury unanimously finds facts alleged

by the state in support of an aggravated sentence, the court may impose an exceptional

sentence "*if it finds,* considering the purposes of this chapter, that the facts found [by the

jury] are substantial and compelling reasons justifying an exceptional sentence."
(Emphasis added.)  RCW 9.94A.535 repeats the language of RCW 9.94A.537(6) and
authorizes a court to impose an exceptional sentence "*if it finds . . .* substantial and
compelling reasons justifying an exceptional sentence."  (Emphasis added.)  To repeat,
RCW 9.94A.535 requires the sentencing court to give its reasons for imposing an
exceptional sentence in "written findings of fact and conclusions of law."

As a result of the sentencing statutory scheme, only the jury performs the task of
factfinding.  Assuming the trial court performs any factfinding, that task is limited to
finding that the jury entered a special verdict finding aggravating circumstances.  *State v.
Sage*, 1 Wn. App. 2d 685, 709 (2017).  The question of whether substantial and
compelling reasons justify an exceptional sentence falls more into the category of a
conclusion of law, than a finding of fact.  *State v. Sage*, 1 Wn. App. 2d 685, 708 (2017).
The legislature could improve RCW 9.94A.535 and RCW 9.94A.537(6) by substituting
the phrase "if it concludes" for "if it finds."

We deem the sentencing court's comments about medical professionals crying,
nighttime assaults, lifelong emotional effects, and permanent scarring unimportant.  The
jury had already rendered the finding as to vulnerable children.  To repeat, Denis
Mulamba must show substantial prejudice to prevail in his restraint petition.  Assuming
the trial court erred in stating these purported facts, Mulamba does not show that the
sentencing court would have withheld the conclusion of substantial and compelling

reasons with a correction of the facts. Since Mulamba could have argued this point in his appeal, he must show prejudice to prevail in his restraint petition. *In re Personal Restraint of Stuhr*, 186 Wn.2d 49, 52 (2016); *In re Personal Restraint of Dove*, 196 Wn. App. 148, 154 (2016). He demonstrates no prejudice.

*Justification for Exceptional Sentence*

Denis Mulamba next contends that reasons enunciated by the sentencing court do not justify an exceptional sentence because factors inherent in the charged crimes echo the aggravating circumstances found by the jury. Denis Mulamba highlights that the sentencing court imposed an exceptional sentence in part due to Jane's permanent scars. In turn, according to Mulamba, permanent scarring inhered in the convictions for first-degree assault and first degree criminal mistreatment, because an element of the crimes is grievous bodily harm.

Denis Mulamba also highlights that the sentencing court based its exceptional sentence on Denis Mulamba's threatening the children with worse harm, Mulamba putting salt on Stanley's wounds, Mulamba forcing the children to retrieve wires used to strike them, Mulamba slapping the children for slow answers, and the children knowing their mother would not help them. This conduct qualifies as part of a previous pattern or practice of assaulting the children by means of torture, an alternative means of committing first and second degree assault of a child. RCW 9A.36.120, 130. According to Mulamba, the conduct forming the "torture" also inhered in the offenses.

Denis Mulamba may hit the bullseye, but he flings his arrow at the wrong bullseye. If the jury found and the sentencing court based the exceptional sentence on the severity of the injuries or a pattern of assaults, Mulamba's arguments would hold relevance. But the jury found and the sentencing court based the sentence on another aggravating factor, the vulnerability of Jane and Stanley. Mulamba fails to argue the validity of the exceptional sentence as based on the vulnerability of the children. Nonetheless, we briefly review the legitimacy of the sentence under this factor. We uphold its validity.

Generally, a trial court must impose a sentence within the standard range. RCW 9.94A.505(2)(a)(i); *State v. Law*, 154 Wn.2d 85, 94, 110 P.3d 717 (2005). The sentencing reform act permits departures from the standard range for the offense if the court finds "substantial and compelling reasons justifying an exceptional sentence." RCW 9.94A.535.

Because the sentencing court imposes an exceptional sentence, the particular crime committed by the offender must be exceptional. A trial court may not base an exceptional sentence on factors necessarily considered by the legislature in establishing the standard sentence range for the offense. *State v. Law*, 154 Wn.2d 85, 95 (2005). The aggravating factor must distinguish the crime committed by the defendant from others in the same category. *State v. Alexander*, 125 Wn.2d 717, 725, 888 P.2d 1169 (1995). Accordingly, the court may not employ an element of the charged offense to justify an exceptional sentence. *State v. Ferguson*, 142 Wn.2d 631, 648, 15 P.3d 1271 (2001); *State v. Stubbs*,

61

170 Wn.2d 117, 240 P.3d 143 (2010). Otherwise, the sentencing reform act commands that sentences be imposed "'without discrimination as to any element that does not relate to the crime or the previous record of the defendant.'" RCW 9.94A.340; *State v. Law*, 154 Wn.2d 85, 97 (2005); *see also* RCW 9.94A.010(3).

The imposition of an upward exceptional sentence, no matter the aggravating factor, possesses both a factual and a legal component. RCW 9.94A.537(3); *State v. Nordby*, 106 Wn.2d 514, 517-18, 723 P.2d 1117 (1986). Before 2004, the court resolved both the factual and legal question. After the United States Supreme Court's decision in *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004), and our legislature's amendment of the sentencing reform act, a jury must find any facts supporting aggravating circumstances beyond a reasonable doubt and by special interrogatory. RCW 9.94A.537(3); *State v. Stubbs*, 170 Wn.2d 117, 123 (2010).

The determination of whether particular circumstances found by the jury warrant an exceptional sentence remains a legal judgment for the court. *State v. Alvarado*, 164 Wn.2d 556, 567, 192 P.3d 345 (2008). The inquiry of whether substantial and compelling reasons exist for an exceptional sentence is a legal conclusion that the trial court remains allowed to make. *State v. Hyder*, 159 Wn. App. 234, 266, 244 P.3d 454 (2011). Conversely, whether the statutory aggravating factors found by the jury are substantial and compelling is not a jury question. *State v. Hyder*, 159 Wn. App. 234, 240 (2011).

The legislature provides an "exclusive list" of factors that can support an exceptional sentence above the standard range. RCW 9.94A.535(3); *State v. Hyder*, 159 Wn. App. 234, 258 (2011). The controlling provision of the SRA declares, in part:

> (3) Aggravating Circumstances—Considered by a Jury—Imposed by the Court
> Except for circumstances listed in subsection (2) of this section, the following circumstances are an exclusive list of factors that can support a sentence above the standard range. . . .
> . . . .
> (b) The defendant knew or should have known that the victim of the current offense was particularly vulnerable or incapable of resistance.
> . . . .
> (y) The victim's injuries substantially exceed the level of bodily harm necessary to satisfy the elements of the offense.

RCW 9.94A.535(3). Denis Mulamba's sentencing court relied on subsection (b), the vulnerability factor, although Mulamba directs his arguments to subsection (y), the grievous injury factor.

Under the vulnerability aggravating factor, the defendant must know of the victim's particular vulnerability. *State v. Vermillion*, 66 Wn. App. 332, 348, 832 P.2d 95 (1992). The vulnerability must be a substantial factor in accomplishing the crime. *State v. Ross*, 71 Wn. App. 556, 565, 861 P.2d 473 (1993). We note that RCW 9.94A.535(3)(b) does not simply describe the victim as "vulnerable," but "particularly vulnerable." Most victims of crime possess some vulnerability. We assume that, for purposes of imposing an exceptional sentence, the victim's vulnerability must be different from the typical victim of the crime.

63

To determine whether the offender's crime qualifies as exceptional among crimes of its genre, we begin with the statutes defining the offenses, and we parse the crime's elements. *State v. Davis*, 182 Wn.2d 222, 229, 340 P.3d 820 (2014) (plurality opinion). The jury found Jane and Stanley particularly vulnerable or incapable of resistance and the vulnerability led to Denis Mulamba's convictions for first degree child assault of Jane, second degree child assault of Stanley, and first degree criminal mistreatment of Jane. The elements of first degree assault of child are:

> (1) A person eighteen years of age or older is guilty of the crime of assault of a child in the first degree if the child is under the age of thirteen and the person:
> (a) Commits the crime of assault in the first degree, as defined in RCW 9A.36.011, against the child; or
> (b) Intentionally assaults the child and either:
> (i) Recklessly inflicts great bodily harm; or
> (ii) Causes substantial bodily harm, and the person has previously engaged in a pattern or practice either of (A) assaulting the child which has resulted in bodily harm that is greater than transient physical pain or minor temporary marks, or (B) causing the child physical pain or agony that is equivalent to that produced by torture.

RCW 9A.36.120. The elements of second degree assault include:

> (1) A person eighteen years of age or older is guilty of the crime of assault of a child in the second degree if the child is under the age of thirteen and the person:
> (a) Commits the crime of assault in the second degree, as defined in RCW 9A.36.021, against a child; or
> (b) Intentionally assaults the child and causes bodily harm that is greater than transient physical pain or minor temporary marks, and the person has previously engaged in a pattern or practice either of (i) assaulting the child which has resulted in bodily harm that is greater than transient pain or minor temporary marks, or (ii) causing the child physical pain or agony that is equivalent to that produced by torture.

64

(2) Assault of a child in the second degree is a class B felony.

RCW 9A.36.130.  Finally, criminal mistreatment in the first degree consists of:

>    (1) A parent of a child, the person entrusted with the physical custody of a child or dependent person, a person who has assumed the responsibility to provide to a dependent person the basic necessities of life, or a person employed to provide to the child or dependent person the basic necessities of life is guilty of criminal mistreatment in the first degree if he or she with criminal negligence, as defined in RCW 9A.08.010, causes great bodily harm to a child or dependent person by withholding any of the basic necessities of life.

RCW 9A.42.020.

An element of each of Denis Mulamba's crimes is a child victim.  Children by their nature are vulnerable and incapable of resisting an adult.  We also consider children to be inherently smaller than adults.  Therefore, the facts of Denis Mulamba's crimes must present dynamics other than age and size before labeling Jane and Stanley as "particularly vulnerable and incapable of resistance."  The crime of criminal mistreatment also entails a parent or a custodian of the child as the culprit.  Thus, to justify an exceptional sentence for criminal mistreatment, the State needed to show factors, other than Mulamba's physical custody of Jane and Stanley, that led to vulnerability.  Denis Mulamba's sentencing court focused on Mulamba's undertaking a caretaker role that led to the opportunity to abuse the children.  Stanley and Jane, at a young age, relied on Mulamba for care, nurturing, sustenance, and provision.  In this role, Mulamba performed acts of psychological torture that escalated and rendered the children more vulnerable and incapable of resistance.  He performed the acts hidden from the public.  Mulamba broke

65

the children mentally and placed them in constant fear of him, thereby contributing to their vulnerability. This fear reduced the chance of one of the children earlier reporting the abuse to third persons. Mulamba chose children whose mother, because of mental illness, would not protect them. Mulamba knew the mother would not protect the children or promptly report his conduct to authorities.

Vulnerability can result from conditions other than the victim's physical condition or stature. *State v. Ross*, 71 Wn. App. 556, 565 (1993); *State v. Nguyen*, 68 Wn. App. 906, 847 P.2d 936 (1993). Preying on victims already conditioned to fear satisfies the vulnerability aggravating factor. *State v. Nguyen*, 68 Wn. App. 906, 918 (1993). Proof of a caregiver status alone suffices for the exceptional sentence for an assault conviction. *State v. Shephard*, 53 Wn. App. 194, 199, 766 P.2d 467 (1988). In *State v. Shephard*, this court found that the existence of a niece and uncle relationship alone rendered the victim vulnerable to sexual contact because the niece spent time in the offender's home during the night.

We repeat that, although Denis Mulamba's caretaker status qualified him for the victim vulnerability aggravating factor on the assault charges, the sentencing court could not employ this status in order to impose an exceptional sentence for criminal mistreatment. Nevertheless, other circumstances, such as an irresponsible mother and psychological torture, suffices for imposing the exceptional sentence on this additional crime.

Again, Denis Mulamba argues against employment of the grievous injury factor, not the particular vulnerability factor. He does not argue nor cite authority for any argument that, because the grievous nature of the injuries might inhere in convictions for first degree and second degree assault, the sentencing court could not base the exceptional sentence on a distinct aggravating factor such as the peculiar vulnerability of the victim. The record need only support one aggravating factor for a reviewing court to affirm a defendant's sentence. *State v. Hyder*, 159 Wn. App. 234, 258-59 (2011).

*Constitutional Right to Jury*

Finally, Denis Mulamba contends imposition of his exceptional sentence breached his right to a jury trial because the sentencing court, not a jury, ruled that "substantial and compelling reasons" justified the sentence. Mulamba emphasizes that the sentencing court reviewed and interpreted evidence and made factual findings, activities reserved for juries. Precedent rejects Mulamba's contention.

The U.S. Supreme Court has repeatedly struck down procedures by which judges, rather than juries, weigh facts and increase the allowable sentence. *Blakely v. Washington*, 542 U.S. 296 (2004); *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002); *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). Most recently, in *Hurst v. Florida*, 577 U.S. 92, 136 S. Ct. 616, 193 L. Ed. 2d 504 (2016), the Court held impermissible sentencing a defendant to death based on a judge's finding that the murder committed by the defendant was especially "heinous,

67

atrocious, or cruel," even though the predicate facts were proved to a jury that determined that the defendant was eligible for the death penalty and the judge considered the jury's recommendation.

To repeat, RCW 9.94A.535 allows the court to impose a sentence outside the standard sentence range if it finds "substantial and compelling reasons justifying an exceptional sentence." Other than the fact of a prior conviction, facts supporting aggravated sentences must be determined in accordance with RCW 9.94A.537. The jury's finding, alone, provides a trial court with a substantial and compelling reason to impose an aggravated exceptional sentence. *State v. Perry*, 6 Wn. App. 2d 544, 549, 431 P.3d 543 (2018). Washington courts view the sentencing court's decision to be in the nature of a conclusion of law, not findings of fact. *State v. Sage*, 1 Wn. App. 2d 685, 708 (2017).

In *State v. Suleiman*, 158 Wn.2d 280 (2006), the Washington Supreme Court rejected the notion that the current state statutory sentencing process for exceptional sentences violates *Apprendi* and *Blakely*. The defendant pled guilty to three counts of vehicular assault and stipulated to the facts set forth in the certification for determination of probable cause but did not agree that the facts formed a legal basis for an exceptional sentence. On appeal, he challenged his exceptional sentence based on one of the victim's particular vulnerability. He argued that Washington's exceptional sentencing law was facially unconstitutional after *Blakely* and that his sentence violated the Sixth Amendment

68

pursuant to *Blakely* because the jury did not find the necessary facts beyond a reasonable doubt. The Supreme Court disagreed.

In *State v. Alvarado*, 164 Wn.2d 556 (2008), the Washington high court noted that *Blakely* recognized that the determination of whether particular circumstances, once established by a jury, warrant an exceptional sentence remains a legal judgment for the court. The Washington Supreme Court reasoned that the question of whether substantial and compelling reasons exist for an exceptional sentence poses a legal conclusion that the trial court may constitutionality resolve.

Denis Mulamba also contends the sentencing court violated RCW 9.94A.537(3) by engaging in fact finding when it imposed an exceptional sentence based on aggravating factors not found by the jury. He emphasizes that his trial court found substantial and compelling grounds to impose the sentence based on Stanley's permanent physical scars, an injury above and beyond the temporary disfigurement requirement for second degree child assault. He also highlights the court's other findings as encompassed in the "deliberate cruelty" aggravator. Mulamba relies on this court's recent decision in *State v. Perry*, 6 Wn. App. 2d 544 (2018).

In *State v. Perry*, a case involving a hit and run, the jury found that the State had proven the aggravating fact that the victim's injuries had substantially exceeded the level of bodily harm necessary to satisfy the elements of the crime. The trial court entered written findings of fact and conclusions of law that the jury had found the aggravating

factor unanimously and beyond a reasonable doubt. The court also entered additional written findings that the victim "may very likely have died had his brother not been walking along the road with him" and the defendant had no excuse for the failure to stop and render aid. *State v. Perry*, 6 Wn. App. 2d 544, 550 (2018). The finding continued that the defendant's unwillingness to stop showed extreme recklessness or carelessness and a level of consciousness of guilt, all of which were substantial and compelling reasons to impose an exceptional sentence.

On appeal, in *State v. Perry*, the defendant argued in part that the court erred by entering findings of fact beyond those made by the jury to support the exceptional sentence. This court agreed, holding that: (i) RCW 9.94A.537(6) restricts the trial court to deciding whether the facts found by the jury are substantial and compelling reasons for an exceptional sentence, (ii) the trial court went beyond deciding whether the facts found by the jury were substantial and compelling reasons when it entered its own written findings of fact, and (iii) the additional findings beyond the jury's finding by special verdict violated the defendant's right to jury. The court ordered resentencing.

We distinguish the action taken by Denis Mulamba's sentencing court. The court reviewed and summarized the evidence before the jury in its oral ruling, but did not expressly enter findings of fact other than substantial and compelling reasons. We find no error in the sentencing court extensively reviewing the facts, during the sentencing hearing, before entering a finding of substantial and compelling reasons.

In *State v. Sage*, the jury entered special verdict forms findings that the aggravating circumstances had been proven beyond a reasonable doubt, and the trial court made the required finding of fact that the special verdicts had been entered and concluded that the jury findings presented substantial and compelling grounds for an exceptional sentence. On appeal, the defendant argued in part that the trial court engaged in prohibited fact finding when reciting the evidence that supported the jury findings. This court observed that, once a jury makes the factual determination that aggravating circumstances have been proven beyond a reasonable doubt, the sentencing court only enters the legal conclusion of whether the facts found were sufficiently substantial and compelling to warrant an exceptional sentence. The court concluded that, when the trial court orally recited the evidence that supported the jury findings at the sentencing hearing but confined its written findings and conclusions to simply noting that the jury entered a special verdict and concluding that the jury findings presented substantial and compelling grounds for an exceptional sentence, the trial court properly analyzed and articulated the basis for the exceptional sentence without engaging in prohibited fact finding.

CONCLUSION

We dismiss Denis Mulamba's personal restraint petition.

71

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

_____
Fearing, C.J.

WE CONCUR:

_____
Pennell, J. — In result only.

_____
Staab, J.